CRAIG H. MISSAKIAN (CABN 125202)
United States Attorney

JEFF MITCHELL (CABN 236225)
Chief, Criminal Division

GEORGE O. HAGEMAN (CABN 332457)
JARED S. BUSZIN (NYBN 5285838)
Assistant United States Attorneys

    60 South Market Street, Suite 1200
    San Jose, California 95113
    Telephone: (408) 535-5044
    George.Hageman@usdoj.gov
    Jared.Buszin@usdoj.gov

Attorneys for United States of America

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br><br>    Plaintiff, )<br><br>  v. )<br><br>RIGOBERTO RAMIREZ a/k/a "Scooby," )<br><br>    Defendant. ) | **CASE NO. 5:24-CR-00226-BLF-002**<br><br>**UNITED STATES' SENTENCING MEMORANDUM**<br><br>Court:      Hon. Beth L. Freeman<br>Hearing Date:  February 24, 2026<br>Hearing Time:  9:00 a.m. |

## I.    INTRODUCTION

Rigoberto Ramirez is a long-time member and one of the leaders of the Salinas Acosta Plaza (SAP) Norteño street gang.  He holds a supervisory and mentorship role over lower-level and aspiring gang members, particularly since his release from custody in a federal drug trafficking case (5:11-CR-00661-RMW).  Most significantly, in June 2023, he solicited the murder of a perceived rival gang member by encouraging a lower-ranking SAP member to "put in work."  He also encouraged other crimes like robberies, and personally engaged in firearms and drug trafficking.  Based on the need for the sentence to reflect the nature and circumstances of the offense, history and characteristics of the defendant, and to protect the public, the government submits that 108 months' (9 years) imprisonment is sufficient, but not greater than necessary, to achieve the goals set forth in 18 U.S.C. § 3553(a).

## II.    PROCEDURAL HISTORY

On April 18, 2024, the defendant and ten other members of SAP were indicted by a federal grand jury on one count of racketeering conspiracy in violation of 18 U.S.C. § 1962(d).  Dkt. 1.  On August 5, 2025, the defendant pleaded guilty.  Dkt. 276.  Sentencing is currently set for February 24, 2025.

## III.    OFFENSE CONDUCT

a.  *The Enterprise: Salinas Acosta Plaza (SAP)*

SAP is a criminal street gang that operates in Salinas, CA, within the larger collection of Norteño criminal street gangs that align with the Nuestra Familia (NF) prison gang and funnel taxes and proceeds from their crimes on the street to Nuestra Familia gang members in prison.  Norteño gang members associate with the color red, and the number "14" (signifying "N" as the 14th letter of the alphabet), including any variations of the number such as "4" and "XIV."  PSR ¶ 12.

SAP originated in the 1990's in the Acosta Plaza apartment complex in Salinas at and around the 900 block of Acosta Plaza.  The gang claims that apartment complex as its territory.  SAP commonly uses the letters and numbers "SAP," "A," "P," "900" and "914," as well as the color red, to identify itself.  SAP members also commonly wear clothing of the Atlanta Braves and Philadelphia Phillies baseball teams to represent the gang, given that the symbols of these teams prominently feature the letters "A" and "P".  *Id.* ¶ 13.  These symbols are commonly, though not universally, displayed by SAP members in tattoos,

UNITED STATES' SENTENCING MEMORANDUM    1
5:24-CR-00226-BLF-002

graffiti, drawings, hand signs, on clothing, and in photos, rap videos, and social media posts as a way of displaying their affiliation, loyalty, and commitment to the gang. *Id.* ¶ 14.

SAP's primary rivals are Sureño criminal street gang members. Sureños recognize the primacy of the Mexican Mafia prison gang, doing the bidding and following orders of Mexican Mafia members. For symbols, they claim the color blue and the number 13 (M is the 13th letter of the alphabet). The rivalry between Norteño and Sureño gang members in Salinas has resulted in numerous acts of violence, including murders, attempted murders, shootings, and assaults. Additionally, SAP members very often target victims who they perceive to be Sureño gang members but who are not actually gang-affiliated, which has led to several murders and attempted murders of non-gang-affiliated victims. *Id.* ¶ 16.

In order to gain entry into the gang, aspiring SAP members may be encouraged or required to put in "work," which is understood to mean criminal conduct such as shootings, robberies, and drug sales. SAP members gain admission, earn status and respect, and rise in rank by committing criminal acts that benefit the gang and/or by spending time in jail or prison for the same. *Id.* SAP members engage in acts of violence, including acts involving murder and assault, against their rivals and, at times, fellow Norteños considered to have violated the gang's rules. SAP members also traffic in controlled substances and firearms. Violence is often the quickest way to gain admission and/or status for the individual gang member. Members are also expected to pay dues to the gang, with greater dues required of those members who traffic in controlled substances. The dues are used, in part, to acquire firearms for distribution, possession, and use by SAP members. *Id.*

SAP members meet and work together to carry out illegal activities for the benefit of SAP and its membership, and also to benefit, more generally, the Norteños and the NF. SAP members fight with other street gangs for control of territory from which they conduct drug trafficking and other crimes, and recruit and intimidate non-gang members. SAP members engage in acts of violence and intimidation to control illegal activities, to claim or maintain established territory, to retaliate against a rival gang or suspected rival gang member, to earn notoriety and respect, to dissuade potential victims and witnesses from reporting crime or cooperating with law enforcement, to discipline fellow gang members, and to send a message to others that they are strong, powerful, and not to be provoked. *Id.*

b. *Defendant's Role in SAP*

From at least May 2006 and continuing through at least April 2024, the defendant has been an SAP Norteño gang member. *Id.* ¶ 17. During this time, he agreed to conduct and to participate in the conduct of the affairs of the Enterprise through a pattern of racketeering activity. As an Enterprise member, he knew and agreed that Enterprise members would commit at least two acts of racketeering activity in the conduct of the affairs of the Enterprise, including acts involving murder, robbery, narcotics trafficking, and witness intimidation – all in service of the Enterprise and its interests. He has "SAP" tattooed on his chest, "P" on his right forearm, "900" on his right upper arm, "blk" on his left upper arm, and four dots on his left hand, all demonstrating his membership in the gang. *Id.*

On April 14, 2011, the defendant sold approximately 14 grams of methamphetamine to a customer for $700. *Id.* ¶ 18. One week later, on April 21, 2011, he sold approximately 29.5 grams of methamphetamine to a customer for $1400. *Id.* One month later, he was arrested in possession of a Glock 21 and 28 rounds of .45 caliber ammunition despite being a prohibited person due to his prior felony conviction for concealed carry of a firearm with a street gang enhancement in Monterey County Superior Court in 2009. *Id.* He agrees that his involvement in drug trafficking, and his possession of a firearm manufactured outside of California, affected interstate and foreign commerce. *See* Dkt. 276 ¶ 2(h). He pled guilty to all three of these offenses in federal court in 2012 and was sentenced to 60 months in prison and 10 years of supervised release. *See generally* 5:11-CR-00661-RMW. He has been on federal supervised release since March 2016. One of his supervised release conditions was that he "not associate with any member of the Norteño gang."

After his release from federal prison, the defendant ascended to a supervisory role within the gang. In that leadership role, he served as a mentor to lower-level and aspiring SAP members. In June 2023, he solicited the murder of a perceived rival gang member by encouraging a lower-ranking SAP member to "put in work," which he knew would be perceived by that lower-ranking SAP member as an order to kill or try to kill the perceived rival gang member. *Id.* ¶ 19. His solicitation ultimately did not result in a homicide, but not because Ramirez ever withdrew or tempered his initial encouragement. *Id.* At other times in 2023, he also encouraged lower-ranking SAP members to commit other crimes like robbery. For

example, he discusses with SAP member Ivan Barriga about "come[ing] up on it" (slang for robbing someone) and "we need a lick today" (slang for robbing someone). *Id.*

After his release, he also continued to engage in drug trafficking. For example, he sold fentanyl in December 2022. A conversation shows him telling SAP member Gustavo Garcia, "yoo wassup with some blues" (blues is slang for fentanyl). *Id.* ¶ 20. He also continued to engage in firearms trafficking in 2023 even though he was prohibited from possessing or dealing firearms. For example, in March 2023, he asks someone "Hey carnal can u bring me glocks ?? From az" and discusses which truck to bring to Arizona to avoid getting stopped at scales and border checkpoints. *Id.* ¶ 21. The discussion includes how the Glocks in Yuma, Arizona, are only $450-$500 as compared to $1100 for a new one in California. *Id.* Then, again, in April 2023, he tells Ivan Barriga "I got a connect With flocks in a box 6 or 7 bills each" (flocks is likely a typo for Glocks). *Id.* He coordinated those drug and firearms sales through his smartphone (most commonly Instagram). He agrees that his involvement in drug trafficking and firearms trafficking affected interstate and foreign commerce. *See* Dkt. 276 ¶ 2(i).

After his incarceration for this instant racketeering case in May 2024, the defendant has made efforts to identify people he suspected were providing information about SAP to law enforcement. He shared this information with people out of custody, including through jail phone calls. PSR ¶ 22. As stated in summary reports of those calls, it appears that the defendant is attempting to spread the word of who he believes is a confidential informant and is asking others to check the paperwork of SAP gang members, and also is giving people parts of the indictment that have information provided by confidential informants. *See id.* Relatedly, in one previous Instagram conversation from December 2023, he tells another person that he "did bunch of removals" (slang for violently attacking someone suspected of being an informant) while in federal custody. *See id.*

## IV.    SENTENCING GUIDELINES CALCULATION

The government agrees that the base offense level is 33, plus 4 for his leadership role, minus 3 for acceptance of responsibility, resulting in a total offense level of 34. *Id.* ¶ 36. The government also agrees with the calculation of criminal history category V. *Id.* ¶ 45. Together, the guidelines range is 235 to 240 months because of the statutory maximum of 20 years. *See id.* ¶ 79; 18 U.S.C. § 1963(a).

## V.    APPLICABLE LAW

The Court should impose a sentence sufficient, but not greater than necessary, to reflect the purposes of sentencing that Congress identified in 18 U.S.C. § 3553(a). *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008). The Court should begin the process of determining an appropriate sentence by calculating the correct sentencing range under the Guidelines. *Id.* After determining the appropriate Guidelines calculation, the Court should then evaluate the sentence for substantive reasonableness in light of the factors set out in Section 3553(a). *Carty*, 520 F.3d at 991-93.

Under 18 U.S.C. § 3553(a), in arriving at the appropriate sentence for the defendant, the Court should consider these factors applicable to this case, among others: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense; (3) the need for the sentence to afford adequate deterrence; (4) the need for the sentence to protect the public from further crimes of the defendant; (5) the need for the sentence to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense. *See* 18 U.S.C. § 3553(a).

## VI.    RECOMMENDED SENTENCE AND SECTION 3553(a) FACTORS

Upon consideration of the Sentencing Guidelines and the factors set forth in 18 U.S.C. § 3553(a)— and in particular the need for the sentence to reflect the nature and circumstances of the offense, the history and characteristics of the defendant, and to protect the public—the government respectfully recommends a sentence of 108 months' (9 years) imprisonment.

### a.    Continuing Criminal Conduct

The defendant is a long-time member of SAP dating back to at least May 2006. Despite having been federally charged, convicted, and sentenced for his drug trafficking back in 2011, his criminal conduct appears to have continued unabated in the decade since his release. If anything, that prior federal case likely increased his power and influence within the gang. Upon his release, he repeatedly violated the conditions of his supervised release by associating with members of the Norteño gang, engaging in

UNITED STATES' SENTENCING MEMORANDUM    5
5:24-CR-00226-BLF-002

drug trafficking in 2022, firearms trafficking in 2023, and of course the murder solicitation in June 2023. Even after being arrested again in May 2024 for the instant offense, he continued to engage in extremely concerning conduct from behind bars by trying to identify the confidential informants and spread the word about them to people on the outside.

### b.  Murder Solicitation

The most serious offense here is the solicitation of murder in June 2023 when the defendant tried to enlist a younger SAP member to "put in work" (i.e. kill) a perceived rival gang member.  As an older member with significant street cred who supervised and mentored younger members, his words and his actions carried significant weight.  The murder ultimately did not happen, but not because the defendant withdrew or tempered his initial encouragement.  Had things turned out differently, both the victim's life and the young shooter's life would have been significantly and irreparably altered.  The scariness of this situation is made all the more real by the fact that the defendant admitted to another person that he "did a bunch of removals" while in custody, *see* PSR ¶ 22, and would later seek to identify suspected informants and cooperators and pass that information to those out on the street, *see id.*

### c.  Mitigating Factors

The government's recommendation is significantly below the guidelines range but it strikes the right balance in the government's view.  His drug trafficking from 2011 is properly considered a racketeering act, but it is something for which he has already served his initial term in custody.  He does have a pending Form 12 in that case, but given the overlapping nature of the violations there, a concurrent sentence is appropriate.  His drug trafficking and firearms trafficking since his release are also clearly criminal acts, but they are not violent criminal acts.  Unlike many of his co-defendants, he is not accused of pulling the trigger or aiding/abetting any murders or attempted murders.  Fortunately for the victim, the solicited, and the solicitor, his most serious act—the murder solicitation in June 2023—did not come to fruition and result in any shootings.  He also accepted responsibility fairly early in this case.

## VII.    VICTIM IMPACT AND RESTITUTION

As of this filing, the government has received a victim impact statement from one victim in this case: the sister of the decedent in overt act D of the superseding indictment (a murder from 2015).  The

government has provided that victim impact statement to Probation. To be clear, the defendant pleaded guilty to the indictment prior to the issuance of the superseding indictment, and the government does not allege that the defendant was personally involved in this act. However, this is still a victim of the broader racketeering conspiracy during the time period in which the defendant was involved in the racketeering conspiracy. The government is not aware of any victims who wish to speak at sentencing, or any restitution requests at this time. If any more of the above are received prior to or at sentencing, the government will inform the Court.

## VIII.  CONCLUSION

Rigoberto Ramirez is a federally convicted felon who continued to hold a supervisory and mentorship role within the Salinas Acosta Plaza (SAP) Norteños. He never committed any violent acts himself, but he solicited a younger member to do it instead. Fortunately, nobody was hurt. Based on the nature and circumstances of the offense, the personal history and characteristics of the defendant, and the need to protect the public, the government recommends a sentence of 108 months' imprisonment followed by a three-year term of supervised release.

DATED:  February 9, 2026

Respectfully submitted,

CRAIG H. MISSAKIAN
United States Attorney

/s/
GEORGE O. HAGEMAN
JARED S. BUSZIN
Assistant United States Attorneys

UNITED STATES' SENTENCING MEMORANDUM   7
5:24-CR-00226-BLF-002